764 A.2d 20

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**John KRATSAS, Appellee.**

**Commonwealth of Pennsylvania, Appellant,**

**v.**

**George M. Kratsas, Appellee.**

**Commonwealth of Pennsylvania, Appellant,**

**v.**

**Amusement Supply Company, Appellee.**

Supreme Court of Pennsylvania.

Argued March 6, 2000.

Decided Jan. 8, 2001.

38

Stephen A. Zappala, Jr., Pittsburgh, Jennifer Digiovanni, Philadelphia, for Com.

James A. Wymard, Pittsburgh, for John Kratsas.

Anthony Mark Mariani, Pittsburgh, for George M. Kratsas.

David B. Wasson, Lower Burrell, for Amusement Supply Co.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

The trial court barred the Commonwealth from prosecuting Appellees for dealing in gambling devices and related offenses, although they are alleged to have distributed video poker machines and other devices modified to permit gambling in violation of an express statutory prohibition. Finding, *inter alia*, that local governmental officials in Western Pennsylvania tolerated gambling activities, the court concluded that the prosecution would be fundamentally unfair and would violate principles of due process under the United States and Pennsylvania constitutions, and the Superior Court affirmed this holding. We reverse.

Appellees, John and George Kratsas, are proprietors of Amusement Supply Company, a third-generation, family-

owned business that leases game and vending machines to establishments throughout Allegheny County. Among the devices supplied are video poker and video slot machines, which are commonly placed in taverns, private clubs, service stations, and grocery and convenience stores. In January of 1991, the Pennsylvania State Police, Bureau of Liquor Control Enforcement ("BLCE"), began investigating allegations of illegal gambling activities in Allegheny County. During the investigation, Appellees were identified as suppliers of particular electronic game machines that had been used for gambling. Specifically, it was alleged that video poker and slot machines were equipped by either Appellees or the machine's distributors with a "knock-off" feature, permitting the removal of credits or games accumulated by a player and thereby allowing the owner of the establishment to pay a dollar value per credit, typically 25 cents.[1] In addition, the machines purportedly contained accounting devices (meters) that recorded the credits, enabling Appellees and the establishment owners to divide the profits. Such devices are significant in determining whether a particular machine is a gambling device. *See generally Commonwealth v. Twelve Dodge City Poker Machines*, 517 Pa. 363, 367, 537 A.2d 812, 814 (1988) (addressing the effect of clearing and recording features upon the determination of whether a machine is a gambling device *per se* ).

On December 14, 1993, BLCE officers executed a search warrant at the office of Appellee, Amusement Supply Company, seizing records and video devices equipped with knock-off mechanisms and internal meters. Search warrants were subsequently executed at eleven establishments in which Appellees had placed video poker and slot machines, and during these searches, machines were seized, inspected, and found to contain knock-off devices and meters. Based upon the information gathered from the investigation and the searches, Appellees were charged with three counts of corrupt organizations, eight counts of gambling devices, criminal conspiracy

---

1. A "knock-off" or clearing device may involve a remote control, a coded series of playing buttons, inputting the player's initials next to the high score, tilting the machine forward, or merely unplugging it.

and dealing in the proceeds of unlawful activities. Charges were not lodged against the manufacturers or distributors of the gaming machines, nor were any charges filed against the proprietors of the establishments from which the machines had been seized.

Prior to trial, Appellees filed an omnibus pre-trial motion, seeking, *inter alia,* dismissal of the prosecution as violative of fundamental fairness and, correspondingly, the due process clauses of the United States and Pennsylvania constitutions. Although Appellees' motion did not further refine the underlying legal theory supporting the requested relief, they emphasized allegations that gambling is pervasive in Pennsylvania; local officials and law enforcement officers issued amusement device licenses or permits to Appellees and others authorizing the use of video poker and slot machines with knowledge that such devices were used for gambling; and the fees to license video poker and slot machines were higher than those required for other game machines, because the devices were used for gambling. Predicated upon these factual averments, throughout their motion Appellees put forward the assertion that "it is the public policy of Pennsylvania that gambling is legal and/or *de facto* legal" as a basis for dismissal.

The trial court conducted a lengthy series of pre-trial hearings on the motion from July of 1995 through September of 1996, during which both Appellees and the Commonwealth presented extensive testimony and other evidence concerning the practice, procedure, and knowledge of local officials relating to the licensing of video poker and slot machines. In particular, Appellees presented evidence that 10,000 video poker and slot machines existed within various establishments throughout Allegheny County, including ninety-nine percent of all private clubs, and that such machines were delivered openly, visibly displayed and played, and, more important, openly used for gambling.[2] Municipal officials license these machines, and, in some instances, police departments affix permits or licenses on the machines themselves. Moreover,

---

2. In this regard, the testimony indicated that virtually every video poker and slot machine was used for gambling.

Appellees offered testimony that local officials are aware that gambling occurs on the machines; higher licensing or permit fees are charged for the video poker and slot machines; these devices generate significant revenue for the municipalities; and local officials "turn a blind eye" toward gambling. In addition, Appellee, George Kratsas, testified that officials within the communities indicated that there was nothing wrong with using such machines for gambling, and that based upon these conversations and the practice of licensing video poker and slot machines, he believed that gambling on the machines was legal.

In response, the Commonwealth challenged the propriety of the pre-trial motion to dismiss, arguing that the due process issue required factual findings that would be more appropriately rendered by a jury. On the substantive points, the Commonwealth offered evidence that: most gambling prosecutions are initiated at the state level; it is difficult to enforce the gambling laws because some of the machines are legal, at least as manufactured; the machines seized in this case contained knock-off devices and meters, which rendered such devices illegal *per se;* and while local officials issued licenses, they did not authorize gambling. The Commonwealth also presented testimony that many of the video poker and slot machines contained warnings that the devices were for amusement only, and, similarly, the local ordinances and the amusement device permits did not authorize gambling. Furthermore, the Commonwealth offered the text of local ordinances indicating the official policy to follow state law, as well as testimony from local officials stating that they refused to license devices that contained clearing and recording features and that they were unaware that video poker and slot machines were used for gambling. Finally, the Commonwealth elicited from George Kratsas that no state official had ever advised him that gambling was legal. Following the hearings, Appellees submitted proposed findings of fact and conclusions of law, and the Commonwealth filed a brief in opposition.

In ruling on Appellees' motion, initially the trial court determined that challenges to a prosecution on due process

grounds are properly made to a court as opposed to a jury, since the United States Supreme Court has explained that such claims may prevent the. government from proceeding with a prosecution. *See generally United States v. Pennsylvania Indus. Chem. Corp.,* 411 U.S. 655, 674, 93 S.Ct. 1804, 1817, 36 L.Ed.2d 567 (1973)[hereinafter *"PICCO "*]. In relation to the merits of the motion, the trial court adopted, in full, Appellees' proposed findings of fact and conclusions of law, including but not limited to the findings that the deployment of illegally modified video poker and slot machines was prevalent, open and notorious throughout Allegheny County; local officials issued licenses or permits for such machines with knowledge that these devices were used for gambling; the fees for the licenses were higher when the device was a video poker or slot machine precisely because of the gambling function; the municipalities gained substantial revenue through such licensure; and, because of the licensing practices of the municipalities, the lack of enforcement of the gambling statute, and conversations with public officials, Appellees believed that their conduct was legal. In the application of due process principles to these findings, the trial court invoked a doctrine predicated upon reliance on misrepresentations of law by government officials, sometimes referred to in the decisional law and commentary as the "official statement mistake of law doctrine," and "entrapment by estoppel." [3] In this regard, the trial court analogized the case to a trilogy of United States Supreme Court cases, *Raley v. Ohio,* 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), and *PICCO,* 411 U.S. at 655, 93 S.Ct. at 1804, which, universally, are recognized as laying. the groundwork for the doctrine. The trial court stated:

**3.** Some courts have disavowed the use of the phrase entrapment by estoppel to describe the doctrine, explaining that it stems from the Fourteenth Amendment's Due Process Clause, not from common law principles of contract, equity or agency, and that it is not an entrapment. *See United States v. Brady,* 710 F.Supp. 290, 295 (D.Colo.1989); *Miller v. Commonwealth,* 25 Va.App. 727, 492 S.E.2d 482, 487 n. 4 (1997). For the sake of clarity and ease of reference, the doctrine is hereinafter referred to as the reliance doctrine.

Just like the defendants in *Raley, Cox* [and] *PICCO* . . ., the defendants in this case were affirmatively led to believe that they were acting within the prescriptions of the law in engaging in the conduct at issue in this case. Because the licensing process was mandatory and the licensing of gambling devices was accepted and promoted, the defendants were obviously within reason to rely upon the conduct of the highest ranking officials of the municipalities in licensing the use of the video gambling devices for the commonly known purpose of gambling.

It is patently unreasonable to hold [Appellees] criminally culpable for the conduct described in the Information filed in this case. Government officials not only permitted, they encouraged and benefited from video gambling. They allowed the defendants in this case to believe that they were engaging in conduct that would not result in criminal prosecution. The clear, overriding evil sought to be remedied by the *Raley, Cox* and *PICCO* cases and their progeny is fundamental unfairness in the initiation of criminal prosecutions. Allowing prosecution of the defendants, under the facts of this case "would be to sanction an indefensible sort of entrapment by the State." The prosecutions of [Appellees] fall squarely within the purview of these cases and this Court should "prevent the Government from proceeding with the prosecution."

(citations omitted). Thus, the trial court accepted Appellees' position that the prosecution violated the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. The Commonwealth lodged an appeal, and a divided panel of the Superior Court affirmed in a one-page, memorandum decision, relying upon the findings of fact and conclusions of law that were adopted by the trial court, with Judge Ford Elliott concurring in the result. Because this case presents issues of first impression in this Commonwealth, we allowed appeal.

Presently, the Commonwealth maintains its position that Appellees' reliance claim should have been submitted to a jury

at trial. Further, the Commonwealth contends that uncontroverted evidence demonstrates that Appellees fully apprehended that gambling (and distribution of gambling devices) was proscribed by law. In this regard, the Commonwealth emphasizes Appellees' multi-generational experience in the game business, from which it argues that familiarity with applicable laws can be inferred. Even if in their general experience Appellees did not gain such awareness, the Commonwealth asserts, they would have necessarily obtained inquiry notice by virtue of the manufacture of the machines without clearing/recording devices necessary to permit gambling, and by encountering the label and manual warnings, as well as other admonitions in written ordinances and other documents pertinent to the licensing and permitting process. According to the Commonwealth, the *ad hoc* method by which machines are modified to permit gambling further evidences Appellees' intent to evade enforcement. Additionally, the Commonwealth notes that the primary enforcement of the gambling laws is accomplished by state, rather than local, officials, and directs our attention to Appellees' admitted awareness of particular law enforcement efforts. Centrally, the Commonwealth asks the Court to distinguish between reasonable reliance based upon a bona fide belief that one's conduct truly complies with the written law, and mere reliance upon lax enforcement and nonfeasance by certain local officials, with a corresponding expectation of freedom from prosecution. Citation is made to the decision of the United States District Court for the Western District of Pennsylvania in *United States v. Conley*, 859 F.Supp. 909 (W.D.Pa.1994)(Lee, J.), in which arguments very similar to those presented by Appellees were considered and rejected.

Appellees, on the other hand, maintain that the trial court properly heard and decided the due process issue as a question of law. Further, they provide many citations to the portions of the record upon which the trial court based its conclusions that municipal authorities acceded to, and indeed, benefited from, the gambling activities in their communities. Appellees contend that this evidence amply supports the trial

court's conclusion that government and law enforcement officials affirmatively misled them into believing that they would not be subject to criminal prosecution for distributing gaming devices. Although Appellees indicate that they received express assurances that their conduct was in fact legal, they also take the position that affirmative misrepresentations by a government official are not an essential prerequisite to the reliance doctrine. Rather, Appellees assert that a citizen may be misled by governmental conduct, and, in the present case, they view the conduct of local officials in licensing devices with the knowledge that they would be used for gambling as sufficient to render their prosecution fundamentally unfair. Defending against the Commonwealth's evidence concerning Appellees' awareness of illegality (or at least potential illegality), Appellees argue that their "belief that they would not be prosecuted, in the context of this case, is no different than a belief that their conduct was legal, especially in light of the identities of the persons creating that belief."

■ Section 5513 of the Crimes Code, captioned "Gambling devices, gambling, etc.," provides that a person is guilty of a misdemeanor of the first degree if he

intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards[.]

18 Pa.C.S. § 5513. As noted, it is well established that machines containing clearing and recording features of the type Appellees are alleged to have distributed are *per se* gambling devices subject to the statutory prohibition. *See Commonwealth v. Irwin*, 535 Pa. 524, 528, 636 A.2d 1106, 1107–08 (1993).

■ In view of this enactment by the Pennsylvania General Assembly, we summarily reject Appellees' assertion, repeated throughout their motion to dismiss, that it is the law of Pennsylvania that gambling is legal on an actual or *de facto* basis. The law is plainly otherwise, as the General Assembly

48

has spoken explicitly, and there is no present challenge to the constitutional validity of its dictate. Appellees cite no authority for the proposition that this or any other court can or should nullify a legislative enactment on the basis that its objectives have been frustrated, or even thwarted pervasively, even by those who are charged with enforcement responsibility. *See generally Conley*, 859 F.Supp. at 934 (stating that, "[a]ssuming that Pennsylvania law enforcement authorities tolerate the use of video poker machines for gambling purposes, the Court holds that such toleration does not in fact legalize otherwise illegal conduct"); *State v. Guzman*, 89 Hawai'i 27, 968 P.2d 194, 210 n. 20 (1998) (stating that "[t]he interests embodied in the criminal law are public interests of the greatest weight[;] [n]o official or agency of government has the authority to waive the public interest, and none—save the legislature—can define the limits of the criminal law") (quoting Note, *Applying Estoppel Principles in Criminal Cases*, 78 YALE L.J. 1046, 1051–52 (1969)).[4]

■ Given the centrality of Appellees' position concerning the general state of Pennsylvania law to their written motion to dismiss, arguably, the trial court could have denied the requested relief based on the failure of such position alone. As the motion contains serious factual averments concerning the conduct of local officials relative to Appellees' own conduct, however, the trial court was justified in making additional inquiry. Thus, while we proceed to evaluate Appellees' legal contentions that prevailed in the trial court and in the Superior Court, we emphasize that these arguments are materially

---

4. Appellees' use of the phrase *"de facto* legal" parallels comments made by former Attorney General Ernest Preate to a legislative committee in 1990, to the effect that, "In most areas of Pennsylvania, video poker machines were so widespread, enforcement efforts were so intermittent and the resulting sanctions so minor that the situation was tantamount to the *de facto* legalization of video poker gambling." *Conley*, 859 F.Supp. at 919 n. 2 (quoting Prepared Statement of Attorney General Ernest D. Preate, Jr., before the House of Representatives Finance Committee, May 24, 1990). These comments must be read in the context of the former Attorney General's advocacy to the Legislature for his position that his office lacked the resources to properly serve its enforcement function, not as a reflection of the substantive law of Pennsylvania.

distinguishable from the erroneous conclusion that the statutory laws underlying the indictments should be deemed by the judiciary to have been effectively extinguished.

■ As noted, the trial court's disposition rests upon the due process clauses of the United States and Pennsylvania constitutions, which, generally, embody the principle of fundamental fairness, entitling every individual to be free from arbitrary or oppressive government conduct. *See generally Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974).[5] The due process inquiry, in its most general form, entails an assessment as to whether the challenged proceeding or conduct "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" *Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 2323, 53 L.Ed.2d 281 (1977) (citation omitted), and that "define[s] the community's sense of fair play and decency." *Dowling v. United States,* 493 U.S. 342, 353, 110 S.Ct. 668, 676, 107 L.Ed.2d 708 (1990)(quoting *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952)). Although due process is viewed as a fluid concept, *see generally County of Sacramento v. Lewis,* 523 U.S. 833, 851, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043 (1998) (citation omitted), several categories of claims implicating its protections have emerged in the decisional law. For example, one line of cases pertains to due process claims involving outrageous government misconduct. *See, e.g., Commonwealth v. Benchino,* 399 Pa.Super. 521, 526, 582 A.2d 1067, 1069 (1990)(discussing due process implications of government involvement in a crime), *cited with approval in Commonwealth v. Mance,* 539 Pa. 282, 290, 652 A.2d 299, 303 (1995).

**5.** Article I, Section 9 of the Pennsylvania Constitution provides, *inter alia,* that a person cannot be deprived of liberty, "unless by the judgment of his peers or the law of the land." This provision has been construed as the functional equivalent of the due process provision in the United States Constitution. *See Commonwealth v. Snyder,* 552 Pa. 44, 52, 713 A.2d 596, 600 (1998). While Appellees have suggested that this Court has the ability to construe Article I, Section 9 more broadly than federal due process, they have offered no particular reasons to support such a departure; therefore, we continue to treat the pertinent constitutional guarantees as coterminous for purposes of this opinion.

Similarly, the reliance doctrine emerged from the trilogy of United States Supreme Court decisions cited by the trial court: *Raley,* 360 U.S. at 423, 79 S.Ct. at 1257, *Cox,* 379 U.S. at 559, 85 S.Ct. at 476, and *PICCO,* 411 U.S. at 655, 93 S.Ct. at 1804. In *Raley,* four individuals were convicted of criminal contempt for refusing to answer questions from Ohio's Un–American Activities Commission after the committee chairman erroneously informed them that they were protected under the state constitution's privilege against self-incrimination (the chairman failed to mention that an Ohio immunity statute applied to their testimony and deprived them of the privilege). The Supreme Court set aside three of the convictions as fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment. In reaching this conclusion, the Court emphasized both the source and the content of the advice that the defendants had received. *See id.* at 437, 79 S.Ct. at 1266 (stating that "[t]he Chairman of the Commission, who clearly appeared to be the agent of the State in a position to give such assurances, apprised [the defendants] that the privilege in fact existed"); *id.* at 438, 79 S.Ct. at 1266 (describing the chairman's comments as active misleading).[6] The Supreme Court also appeared to take into consideration the element of immediacy connected with the testimonial setting. *See id.* at 438–39, 79 S.Ct. at 1267 (characterizing the chairman as "the voice of the State most presently speaking to the [defendants]"). The Court explained that sustaining a conviction under the circumstances "would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Id.* at 426, 79 S.Ct. at 1260.[7]

In *Cox,* the Supreme Court applied *Raley* to reverse a conviction for violating a statute prohibiting demonstrations

6. The fourth conviction was affirmed by an equally divided Court.

7. This passage from *Raley* appears to be the basis for the source of the "entrapment by estoppel" denomination for the reliance doctrine. In this context, however, the Court's allusion to the doctrine of entrapment has been aptly characterized as a metaphor, intended to sharpen the focus upon fundamental fairness. *See generally* Parry, *Culpability, Mistake and Official Interpretations of Law,* 25 A.J.Crim. L. 1, 37 (Fall 1997)[hereinafter "Parry, *Culpability, Mistake* "].

near a courthouse, because the picketers had been advised by the local police chief that they could lawfully protest across the street. *See Cox,* 379 U.S. at 571, 85 S.Ct. at 484 (stating that the "highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did"). The Court noted the "lack of specificity" in the use of the word "near" in the statute, which the Court found "foresees a degree of on the spot administrative interpretation by officials charged with responsibility for administering and enforcing it" and renders it "apparent that demonstrators ... would justifiably tend to rely on this administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568–69, 85 S.Ct. at 483.

Finally, in *PICCO,* the Court addressed a conviction for violating a statute that prohibited the discharging of refuse into navigable waters. At the time of the offense, the responsible administrative agency, the Army Corps of Engineers, had interpreted the statute as applying solely to water deposits that affected navigation, and such interpretation was reflected in the agency's regulations. *See PICCO,* 411 U.S. at 658 59, 93 S.Ct. at 1808–09. At trial, the court refused to allow PICCO to present evidence and obtain a jury instruction that it had acted upon a good faith belief that the administrative construction given the statute rendered its conduct of discharging industrial refuse permissible. The Supreme Court reasoned, however, that PICCO had a right to consult the Corps of Engineers' regulations for guidance respecting the requirements of the statute, and that "to the extent that the regulations deprived PICCO of fair warning ..., traditional notions of fairness prevent the Government from proceeding with the prosecution." *Id.* at 674, 93 S.Ct. at 1816–17. Thus, the Court remanded the case, holding that PICCO was entitled to present evidence to support its claim that it was affirmatively misled. *See id.* at 675, 93 S.Ct. at 1817.

Developments in due process jurisprudence, perhaps by necessity, have frequently occurred incrementally in the context of specific cases, with the Supreme Court reserving

broader analysis for future cases. *Raley, Cox* and *PICCO* are no exceptions, and have raised many questions, as reflected in the following critical commentary:

> Although defendants increasingly invoke entrapment by estoppel, courts have not adequately considered basic questions such as: From whence does entrapment by estoppel derive? What are the prerequisites to entrapment by estoppel? Does it apply equally to crimes requiring specific intent, general intent, and no intent at all? Does entrapment by estoppel raise a question for a judge or a jury?

Sean Connelly, *Bad Advice: The Entrapment by Estoppel Doctrine in Criminal Law,* 48 U. MIAMI L.REV. 627 (Jan.1994)[hereinafter "Connelly, *Bad Advice* "].[8] Such questions are implicated by the Commonwealth's arguments as framed, the first of which suggests that the jury should have a role in determining the reliance doctrine's applicability. Subsumed within this issue are additional questions concerning the doctrine's relevance in relationship to the determination of the substantive elements of criminal offenses, whether its invocation should be permitted as a common law affirmative defense, and, if not, whether there is a due process justification for its consideration by a jury where the factual basis is not sufficient to warrant preclusion of the prosecution on a pre-trial basis.

The reliance doctrine has been described as a narrow exception to the maxim that ignorance of law is no excuse. *See, e.g., United States v. Spires,* 79 F.3d 464, 466 (5th Cir.1996); *United States v. Bruscantini,* 761 F.2d 640, 642 (11th Cir.), *cert. denied,* 474 U.S. 904, 106 S.Ct. 271, 88 L.Ed.2d 233 (1985). Some state legislatures, following the example in Section 2.04(3)(b) of the Model Penal Code, have enacted statutes providing for a limited defense based upon a mistake of law in a manner that parallels the reliance doctrine,

---

8. *See generally Conley,* 859 F.Supp. at 926 (noting that "[t]he interpretations given the [reliance] doctrine have been less than uniform"); Parry, *Culpability, Mistake,* 25 A.J.CRIM. L. at 3 (observing that "[n]o court or commentator has provided a convincing and coherent account of the basis for the doctrine or made a sustained effort to define its limits beyond stating that it is required by due process").

affording an elemental structure and the status of an affirmative defense.[9] In such jurisdictions, it is clear that, even if the circumstances involving an official misrepresentation are not sufficient to require dismissal of the prosecution on due process grounds, the defendant would generally be permitted to present them to the jury in the context of the affirmative defense. However, the availability of a reliance defense on such terms (independent of constitutional due process principles and constraints) is not so clear in Pennsylvania—although the General Assembly adopted many provisions of the Model Penal Code in enacting the comprehensive Crimes Code,[10] it declined to adopt Section 2.04(3)(b) or to effectuate any sub-

---

**9.** Section 2.04 of the Model Penal Code provides, in relevant part:

(3) A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:

(a) the statute or other enactment defining the offense is not known to the actor and has not been published or otherwise reasonably made available prior to the conduct alleged; or

(b) he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for interpretation, administration or enforcement of the law defining the offense.

(4) The defendant must prove a doctrine arising under Subdivision (3) of this Section by a preponderance of evidence.

MODEL PENAL CODE § 2.04(3)(a-b), (4) (rev. ed.1985). *See, e.g.,* Ark.Code Ann. § 5-2-206(c) (1999); Haw.Rev.Stat. § 702-220 (1999); Ill.Rev. Stat. ch. 720, para. 5/4-8(b) (2000); Kansas Stat. Ann. § 21-3203(2) (1999); Mo.Rev.Stat. § 562.031(2) (2000); Mont.Code Ann. § 45-2-103(6) (1999); Utah Code Ann. § 76-2-304(2) (1999). *See generally Guzman,* 968 P.2d at 207 n. 17.

**10.** For example, Section 304 of the Crimes Code, 18 Pa.C.S. § 304 (Ignorance or mistake), pertaining to mistakes of fact, is derived from Section 2.04 of the Model Penal Code. Section 304 provides that:

Ignorance or mistake as to a matter of fact, for which there is reasonable explanation or excuse, is a defense if:

(1) the ignorance or mistake negatives the intent, knowledge, belief, recklessness, or negligence required [to] establish a material element of the offense; or

(2) the law provides that the state of mind established by such ignorance or mistake constitutes a defense.

18 Pa.C.S. § 304.

stantial equivalent. Indeed, official commentary reflects the legislative intent that "[g]enerally speaking, ignorance or mistake of law is no defense." 18 Pa.C.S. § 304 (official comment). Although this Court would appear to have substantially endorsed a reliance defense in overturning a contempt conviction in *Commonwealth v. Fisher*, 398 Pa. 237, 248, 157 A.2d 207, 213 (1960), criminal contempt is a unique area of the law, and it is thus questionable how broadly the Court's analysis in *Fisher* should be read. Moreover, *Fisher* preceded the comprehensive enactment of the Crimes Code, and thus, even to the extent that the holding was intended to be read broadly, the continued viability of such construction must be determined in light of the subsequent legislative prescriptions.

Likewise, it is questionable whether, and to what extent, the reliance doctrine is relevant to substantive elements of criminal offenses, in particular, the element of intent. Several commentators advocate the substantial dilution of the maxim that ignorance of law is no excuse, and there would appear to be some movement in this direction in the federal courts.[11] Certainly, there are policy arguments to be made toward this end.[12] To the extent that such a course is not mandated by

11. *See generally* Sharon L. Davies, *The Jurisprudence of Willfulness: An Evolving Theory of Excusable Neglect*, 48 Duke L.J. 341, 367–87 (Dec.1998)(citing the United States Supreme Court decisions in *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), *Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), and *Bryan v. United States*, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998), as reflecting an evolving "jurisprudence of willfulness," fostering the construction of specific intent provisions in federal statutes as requiring proof of an accused's knowledge of the law)[hereinafter "Davies, *The Jurisprudence of Willfulness* "]; Connelly, *Bad Advice*, 48 U. Miami L.Rev. at 648 (arguing that "[w]here a criminal statute already requires specific proof of culpable intent, the constitutional doctrine is superfluous because a defendant who acted in good faith reliance on government advice that his conduct was legal cannot have intended to commit the offense"); Richard G. Singer, *The Proposed Duty to Inquire as Affected by Recent Criminal Law Decisions in the United States Supreme Court*, 3 Buff.Crim. L.Rev. 701, 754 (2000)(predicting, in light of United States Supreme Court decisions, that "[t]he prospect of a requirement of a full mens rea applied to mistakes of both fact and law is on the horizon").

12. *See, e.g.,* Parry, *Culpability, Mistake*, 25 Am. J.Crim. L. at 49 (arguing that "a moral system of criminal responsibility can no longer allow the

constitutional principles, however, in Pennsylvania, the enactments and intentions of the General Assembly must play a central role in evaluating its wisdom. *See* Davies, *The Jurisprudence of Willfulness*, 48 DUKE L.J. at 412–13 (arguing that a construction of specific intent requirements that requires proof of an accused's knowledge of the law is inimical to congressional judgments and, therefore, violates the rule of law and principles of separation of powers). In this regard, the legislative admonition that, "[g]enerally speaking, ignorance or mistake of law is no defense," 18 Pa.C.S. § 304 (official comment), is, again, highly relevant.[13] *See generally Conley*, 859 F.Supp. at 930 (finding that "specific intent in the sense of an intention to violate a known legal duty is not in any way an element of the illegal gambling business offense at issue").[14]

punishment of individuals whose assessments and choices were not blameworthy, and who lacked a fair opportunity or capacity to adjust their behavior to the law due to an official misinterpretation of the law"). Such commentators frequently argue that, since the maxim arose in context of *malum in se* offenses, its application should be reevaluated in the current environment in which the citizenry must conform their conduct to a plethora of statutes and regulations that are *malum prohibitum* in nature. *See id.* at 7–17.

13. Similar commentary has been made concerning the doctrine of entrapment, with questions arising concerning its common-law basis, constitutional implications, status as an affirmative defense, and relevance in relation to substantive elements of a crime. *See, e.g.*, Note, *Reconfiguring the Entrapment and Outrageous Government Conduct Doctrines*, 84 GEO. L.J. 1945, 1952–62 (May 1996). In comparison to a reliance defense, however, the doctrine of entrapment, while also focusing upon the conduct of law enforcement officials, *see Commonwealth v. Weiskerger*, 520 Pa. 305, 312, 554 A.2d 10, 14 (1989), is a legislatively recognized affirmative doctrine under the Pennsylvania Crimes Code. *See* 18 Pa.C.S. § 313.

14. In contrast to *Conley's* holding essentially foreclosing presentation of a reliance defense at trial, a number of courts have analyzed the doctrine as in the nature of an affirmative defense, thus permitting it to be presented to the factfinder even in instances in which the trial court has made a pre-trial determination that the prosecution is not barred on due process grounds. *See, e.g., United States v. West Indies Transport, Inc.*, 127 F.3d 299, 311–12 (3rd Cir.1997), *cert. denied*, 522 U.S. 1052, 118 S.Ct. 700, 139 L.Ed.2d 644 (1998); *United States v. Smith*, 940 F.2d 710, 714 (1st Cir.1991); *Guzman*, 968 P.2d at 210; *Miller*, 492 S.E.2d at 488. *Accord Spires*, 79 F.3d at 466; *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir.1994); *United States v. Abcasis*, 45 F.3d 39,

Although the invocation of a reliance defense in the trial setting thus raises substantial and complex questions, our present review concerns a pre-trial motion to dismiss and thus implicates a narrower range of issues. In this respect, we have no doubt that the due process provisions of the United States and Pennsylvania constitutions, at least in a narrow set of unique and compelling circumstances, would serve both as an exception to the maxim that mistake of law is no defense, *see generally Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957); *Rankin v. Mortimere,* 7 Watts 372, 374 (1838), and ultimately to foreclose a criminal prosecution. *See PICCO,* 411 U.S. at 674, 93 S.Ct. at 1817(stating that the absence of fair warning "prevent[s] the government from proceeding with the prosecution"). Therefore, where an adequate claim of such circumstances is presented in the form of a pre-trial motion to dismiss, it is incumbent upon the trial courts to determine the doctrine's applicability and effect. They are fully authorized to take evidence, to the extent necessary, and to make dispositive findings and conclusions concerning whether trial should proceed. *See generally Conley,* 859 F.Supp. at 931 (concluding that "the Due Process reliance on misleading government conduct [doctrine], being founded upon the Constitutional notion of fundamental fairness ... is an appropriate issue for the Court to determine"); *cf. United States v. Gonzales,* 927 F.2d 139, 143–44 (3d Cir.1991)(describing the procedure for claims made under the due process doctrine of outrageous government conduct, and characterizing the reliance doctrine as "closely analogous"). Thus, our disposition of this case need not rest, as the Commonwealth's arguments intend, upon the relevance (or irrelevance) of a reliance defense before a jury. Further, additional consideration of the availability of reliance as an affirmative defense, and its relationship to

42–43 (2nd Cir.1995); *United States v. Hurst,* 951 F.2d 1490, 1499 (6th Cir.1991), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992); *United States v. Hedges,* 912 F.2d 1397, 1405–06 (11th Cir. 1990). Indeed, in light of the Third Circuit Court of Appeals' treatment in *West Indies Transport,* it is arguable that this portion of the *Conley* court's analysis has been implicitly overruled for purposes of Third Circuit jurisprudence.

substantive elements of gambling crimes, is unnecessary at this juncture. *See generally Conley*, 859 F.Supp. at 928 (noting that "the issue of fundamental unfairness due to the defendant's reliance on misleading government conduct is independent of the element of intent"). Accordingly, we confine our remaining inquiry to the matter at hand, namely, whether the trial court erred in its determination that principles of fundamental fairness proscribed Appellees' prosecution.[15]

With our present inquiry thus limited, we return to the source of the due process reliance doctrine, *Raley, Cox* and *PICCO*, to examine the doctrine's contours. *Raley* represented a very narrow context for its application: the testimonial setting, in which there was a high degree of immediacy, and an imposing authority delivering the advice while already asserting some degree of control over the defendants. *Cox*, however, made it clear that the doctrine could be applied more broadly, although the element of immediacy was still evident. *PICCO* confirms that the doctrine applies in a broader range of circumstances, where the erroneous advice from a governmental official is neither immediate nor direct. *See also United States v. Laub*, 385 U.S. 475, 487, 87 S.Ct. 574, 581, 17 L.Ed.2d 526 (1967). *See generally* Parry, *Mistake, Culpabili-*

15. Significantly, although our research has disclosed substantial questions as to the availability of a reliance defense outside the context of a pretrial motion to dismiss, *see generally Conley*, 859 F.Supp. at 936 (indicating that the evidence underlying the failed claim under the reliance doctrine would be excluded from trial), the Commonwealth in this case fully endorses its availability at trial. *See* Brief for Appellant at 18 (stating that "[i]f proven at trial and credited by the jury, the [reliance defense] prevents a conviction"). Thus, there is presently no advocate for the contrary position. Further, the parties have not developed specific positions concerning the defense as it relates to the substantive elements of gambling offenses or, more generally, the intent of the General Assembly, or its derivation as an affirmative defense. Rather, their arguments focus upon their respective interpretations of the facts, and the overall assessment of fairness. Matters of substantial significance and complexity are best decided in cases where the parties in the first instance have sharpened the focus, and where such matters are essential to the disposition at hand. Since neither of these conditions is present, sound jurisprudential principles weigh in favor of our decision to limit our remaining analysis and holding here to the pretrial context.

*ty*, 25 AM. J.CRIM. L. at 41 (characterizing the decisions of the United States Supreme Court as "setting the stage for the emergence of entrapment by estoppel as a general equitable and constitutional constraint upon government action").[16]

■ These decisions, nevertheless, must be read in light of the Court's admonition that the doctrine is inherently a narrow one and, as other courts have indicated, "rarely available." *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir.1994), *cert. denied*, 514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995).[17] Thus, courts, in attempting to apply the doctrine within appropriate constraints, have framed a series of relevant considerations, which vary to some degree among jurisdictions. *See generally West Indies Transport*, 127 F.3d at 312 (collecting cases).

First, in order to support invocation of the doctrine, most jurisdictions require that there be an affirmative representation that certain conduct is legal. *See Cox*, 379 U.S. at 571, 85 S.Ct. at 484; *West Indies Transport*, 127 F.3d at 312; *United States v. Aquino–Chacon*, 109 F.3d 936, 938 (4th Cir.), *cert. denied*, 522 U.S. 931, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997); *Guzman*, 968 P.2d at 207; *Miller*, 492 S.E.2d at 488.[18] It is

16. For commentary arguing that *Cox, Laub* and *PICCO* properly should have been decided on different grounds, see Parry, *Culpability, Mistake*, 25 AM. J.CRIM. L. at 41–46.

17. *See also Guzman*, 968 P.2d at 209–10 (cautioning that a due process reliance doctrine is only applicable in a narrow range of circumstances and where essential elements are clearly established); *United States v. Gutierrez–Gonzalez*, 184 F.3d 1160, 1166 (10th Cir.)(" '[t]he courts invoke the doctrine of estoppel against the government with great reluctance' " (citation omitted)), *cert. denied*, 528 U.S. 1011, 120 S.Ct. 513, 145 L.Ed.2d 397 (1999). *See generally United States v. Tallmadge*, 829 F.2d 767, 776 (9th Cir.1987) (Kozinski, J., dissenting)(stating that the doctrine must be " 'construed very narrowly because it permits the individual official to suspend or alter statutory penal law simply by misinterpreting it' " (citation omitted)).

18. While this condition is often framed in terms of "active misleading" or "affirmative misrepresentation," because some official statements may not be truly mistaken, as with an administrative interpretation, the phrase affirmative representation allows for those circumstances. *See Guzman*, 968 P.2d at 207 n. 18. In many cases, courts have found the reliance doctrine unavailable based upon a failure to allege a sufficient affirmative misrepresentation or active misleading. *See, e.g., United*

frequently observed that mere laxity in law enforcement will not satisfy this condition, *see, e.g., Hurst,* 951 F.2d at 1499, nor will vague or contradictory messages. *See Ramirez–Valencia,* 202 F.3d at 1109; *Smith,* 940 F.2d at 715. Second, the representation should be made by an official or a body charged by law with responsibility for defining permissible conduct respecting the offense at issue. *See generally Spires,* 79 F.3d at 466 (stating that the official must be empowered to render the claimed erroneous advice or must be an agent who has been authorized to render such advice); *United States v. Austin,* 915 F.2d 363, 366 (8th Cir.1990) (explaining that "it is the authority, whether apparent or actual, of the government official that is crucial to the entrapment by estoppel doctrine"), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1626 (1991). Third, actual reliance upon the official's statements should be present, *see West Indies Transport,* 127 F.3d at 313, which condition has also been stated as a requirement that the defendant believe the official. *See Corso,* 20 F.3d at 528; *Hedges,* 912 F.2d at 1405. Finally, the view is commonly held that reliance must be in good faith and reasonable given the identity of the government official, the point of law represented, and the substance of the statement. *See West Indies Transport,* 127 F.3d at 313. "Reliance is reasonable and in good faith only where a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *Id.* at 313 n. 13. Courts generally impose the burden upon the defendant to satisfy all elements. *See, e.g., id.* at 313.

 Upon consideration of these factors, particularly as elaborated in *West Indies Transport,* we endorse them as a

States v. Ramirez–Valencia, 202 F.3d 1106, 1108 (9th Cir.), *cert. denied,* 531 U.S. 892, 121 S.Ct. 218, 148 L.Ed.2d 154 (2000); *West Indies Transport,* 127 F.3d at 313; *United States v. Aquino–Chacon,* 109 F.3d 936, 939 (4th Cir.), *cert. denied,* 522 U.S. 931, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997); *United States v. Nichols,* 21 F.3d 1016, 1018 (10th Cir.)(doctrine rejected because government agent had spoken ambiguously, rather than inaccurately), *cert. denied,* 513 U.S. 1005, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994); *United States v. Corso,* 20 F.3d 521, 528 (2nd Cir.1994); *Hurst,* 951 F.2d at 1499; *United States v. Brebner,* 951 F.2d 1017, 1025–26 (9th Cir.1991).

useful guide on consideration of a colorable claim based upon the due process reliance doctrine. In harmony with the United States Supreme Court's approach to due process challenges, and considering the impossibility of identifying all forms of conduct and practices that may implicate protection, we recognize that such requirements should not be applied rigidly as against a defendant whose claims clearly implicate fundamental fairness. *See generally* Parry, *Mistake, Culpability*, 25 AM. J.CRIM. L. at 44 (suggesting that the "Supreme Court did not view entrapment by estoppel as a separate doctrine of due process, but just as one way of describing basic due process principles"). These considerations do, nevertheless, properly channel the fairness inquiry in the totality of the circumstances and appropriately reflect the substantial constraints upon the reliance doctrine. *See generally Smith*, 940 F.2d at 714. We also note that the relevant considerations have been developed in cases considering the applicability of the doctrine both in the pre-trial and in the trial context where permitted as a defense. In the pre-trial setting, however, the defendant's ultimate burden is to establish the rare circumstance in which a prosecution may be deemed fundamentally unfair pursuant to exacting due process standards. *See Dowling*, 493 U.S. at 353, 110 S.Ct. at 674.

More specific to the circumstances presently before us, we also have the benefit of the detailed decision by the United States District Court for the Western District of Pennsylvania in *Conley*, 859 F.Supp. at 909, addressing a substantially identical due process claim lodged in federal court. The *Conley* defendants were the owner and operator of Duffy's Vending and his associates and employees; Duffy's Vending facilitated gambling activities employing video poker machines, and the defendants were charged with federal crimes predicated upon such activities. *See generally United States v. Conley*, 833 F.Supp. 1121, 1124 (W.D.Pa.1993). Several of the defendants pursued a motion to dismiss based, *inter alia*, upon the reliance doctrine. The parties stipulated that video poker machines were present throughout Western Pennsylvania, found most frequently in bars, lounges, taverns, restaurants, coffee shops, social halls or fraternal and veterans'

organizations, and laundromats; municipalities imposed annual fees or charges on amusement devices; and some of the defendants had paid such fees and charges and received licenses. At hearings, the defendants attempted to introduce testimony concerning the licensing of gambling devices; however, the district court sustained the government's objection, indicating that

> [b]ecause not all video poker machines are *per se* illegal in Pennsylvania, . . . the mere issuance of a license for a video poker machine, without a showing that the issuing authority had actual knowledge of the machines' intended illegal use, was insufficient support for a doctrine of *de facto* legality.

*Conley*, 859 F.Supp. at 916; *see also id.* at 931 (noting that "the Court cut short Defendants' presentation of their evidence on the basis that it was insufficient as a matter of law and hence irrelevant"). The district court nevertheless permitted the defendants to make various proffers, in which they indicated that they would have presented, *inter alia*, facts very similar to those found by the trial court in this case, including, that: it was common knowledge that video poker machines were used for illegal gambling; municipalities and Pennsylvania law enforcement officials tolerated the use of video poker machines for gambling purposes; municipalities adjusted permitting fees annually, due to the fact that the governing bodies knew the amount of revenue generated by video poker machines; and enforcement efforts at both the local and state levels were extremely lax or nonexistent. *See Conley*, 859 F.Supp. at 918–20. In response, the government challenged the adequacy of the record upon which the defendants relied, contending that, under the reliance doctrine, any assurances of legality must originate from a federal official, and maintaining that the issuance of permits and licenses in a permissive atmosphere is not the type of government conduct sufficient to support invocation of the doctrine. *See Conley*, 859 F.Supp. at 921.

In assessing the defendants' due process claim, the district court indicated that it would review the factual allegations in the light most favorable to them, since it had cut short their factual presentation. *See Conley*, 859 F.Supp. at 931. After

detailing the background and holdings of *Raley, Cox* and *PICCO,* and rejecting the government's argument that the federal government could not be prevented from enforcing its criminal laws by the conduct of state or local officials,[19] the district court indicated that the material allegations of the motion nevertheless did not satisfy the reliance doctrine for several reasons. With regard to the presence or absence of a misrepresentation, the court indicated that none of the defendants' proffered evidence sufficed to demonstrate that the conduct of Pennsylvania officials raised any ambiguity as to the legality of gambling conducted through the use of illegal poker machines. The court explained that, in such circumstances, it was bound to defer to the government's decision to prosecute a defendant, absent certain limited classes of abuse of prosecutorial discretion. *See Conley,* 859 F.Supp. at 933.[20] Further, the court stated:

> Assuming that Pennsylvania law enforcement authorities tolerate the use of video poker machines for gambling purposes, the Court holds that such toleration does not in fact legalize otherwise illegal conduct. Such toleration is not a valid ground upon which to base a claim of having been misled by the government and reliance on lax enforcement is not reasonable in view of the clear state of Pennsylvania law throughout the relevant period prohibiting gambling with video poker machines.

*Conley,* 859 F.Supp. at 934.

The district court then discounted various specific proffers made by the defendants in terms of their effect in establishing

**19.** *See Conley,* 859 F.Supp. at 932 (stating that "[a] *per se* rule in a federal criminal prosecution predicating the availability of the Due Process doctrine on federal action saps the notion of fundamental fairness of its flexibility and leaves the door open for fundamentally unfair prosecutions to be upheld").

**20.** The district court further explained:

> The exercise of prosecutorial discretion in a world of limited resources may entail choosing upon which crimes to focus. A choice at a point in time or by a particular administration to focus on certain crimes is also a choice to make the enforcement of the crimes not chosen a lesser priority.

*Conley,* 859 F.Supp. at 933.

an affirmative misrepresentation on the part of the Common-wealth. *See Conley,* 859 F.Supp. at 934–35. Indeed, the court found that various of the defendants' proffers affirmatively established that the defendants were in fact on notice that Pennsylvania authorities considered their activities unlawful. *Conley,* 859 F.Supp. at 934. With regard to the conduct of local authorities, the court determined that the defendants could not rely upon the municipal ordinances pursuant to which licenses were issued, since the ordinances generally were written to prohibit licensure for gambling purposes. *See Conley,* 859 F.Supp. at 935. While acknowledging that the "[d]efendants' proffer alleges a disconcerting state of affairs regarding local governments' relationships with illegal video poker gambling in the Western District of Pennsylvania," the court indicated that it was "not persuaded that the [d]efendants' being prosecuted is fundamentally unfair within the meaning of the Due Process clause." *Id.* Describing two ways in which the local government conduct alleged could be inter-preted, the court stated:

> First, the local government conduct can be given a sinister interpretation. Under this interpretation, local government officials condoned, allowed, and literally placed their stamps of approval on conduct they knew to be illegal in exchange for licensing fees. But ... "[a]llowing a state official's alleged complicity in illegal activities to void the convictions here would violate the intent of Congress in enacting section 1955 and distort the clear due process doctrine set forth in *Cox* and *Raley.* Moreover, corruption of government offi-cials—federal, state or local—certainly does not raise Due Process concerns about prosecuting any of the parties in-volved.

> Second, the local government officials, notwithstanding their alleged knowledge of the intended use of the machines, may have issued licenses relying upon the clear Pennsylvania law indicating that not all machines are *per se* illegal and relying on other agencies to ensure compliance with the Pennsylva-nia gaming statute. This scenario reflects a mere laxity in

enforcement, which, in view of prosecutorial discretion, cannot invalidate an otherwise valid prohibition.

\* \* \*

The conduct of local government officials may have created a certain ambiguity in the form of mixed signals to the [d]efendants. [The] [d]efendants, however, are charged with conducting an illegal gambling business in violation of state law, not in violation of the local ordinances. Reliance upon the ambiguous conduct of local officials in enforcing an otherwise clear statute of state-wide application is not reasonable. The ordinances adopted by the local governments did not purport to alter state law, and the [d]efendants have proffered no evidence indicating that the local governments ever claimed the authority to interpret the state statute. No government official at any level ever expressly reassured the [d]efendants that their conduct in the ambiguous local milieu was in fact legal. The [d]efendants' proffer may support an inference that, in the years before 1988, they believed they would not be prosecuted for their gambling activities. Nonetheless, the proffer and record is devoid of evidence ... that the [d]efendants actually believed their gambling activities were in fact legal activities under Pennsylvania law, and their lobbying activities strongly suggest to the contrary.

*Conley,* 859 F.Supp. at 935–36. Thus, the district court held that, under the totality of the circumstances, the defendants had not been misled by government officials into believing that their illegal gambling activities were, in fact, legal, *id.* at 936, and, accordingly, the defendants had failed to persuade the court that their prosecution was fundamentally unfair. *See id.*

The *Conley* decision is noteworthy for the procedure employed by the trial court, the comprehensiveness of its analysis, and its sound merits disposition. Faced with a pre-trial motion raising at least an arguable claim that the defendants' prosecution should be barred on grounds of fundamental fairness, the *Conley* court proceeded to conduct a hearing to

allow the defendants to establish a factual basis for this claim. The court, however, asserted a substantial degree of control over the presentation of the evidence. When it became apparent that the defendants were proceeding on a theory that was not sufficient to warrant dismissal, the court truncated the hearing, but nevertheless permitted the defendants to make their proffers, which could be (and were) taken into account in the court's ruling on the merits of the defense. The court's handling was clearly appropriate to the circumstances and judicious in administration. On the merits, the court recognized and gave full effect to the patent distinction between the defendants' claim of *de facto* legalization and good faith, reasonable reliance upon an official representation that conduct is in fact legal. Thus, it properly denied the claim, concluding the pre-trial proceedings and permitting the prosecution to move forward.

In the present case, in their written motion, Appellees employed an approach very similar to that of the defendants in *Conley*. They described the state of affairs in Western Pennsylvania, characterized by the *Conley* court as "disconcerting," alleging conduct on the part of local officials that certainly presented a colorable basis to support a conclusion that Appellees might have been unfairly misled. Their motion, however, was patently ambiguous as to whether the claim they were asserting was that they were truly ignorant of state law and acted in the good faith, reasonable belief that the laws of Pennsylvania did not criminalize the conduct. The motion left open the substantial possibility that Appellees were aware or had reason to believe that their conduct was in technical violation of the law, but chose to proceed based upon lax or collusive conduct of local officials and a corresponding expectation that they would not be prosecuted.[21] In the face

21. As noted, we reject the argument that an expectation of non-enforcement, at least in the absence of extraordinary circumstances, will support application of the reliance doctrine to bar a prosecution. Although the United States Supreme Court has employed rhetoric that might support such application, *see Laub*, 385 U.S. at 487, 87 S.Ct. at 581 (suggesting that the reliance doctrine may apply to "assurance[s] that punishment will not attach"), we read this in the context of the

of such an ambiguity, a degree of judicial skepticism was warranted from the outset, particularly in view of Appellees' longstanding connection to the game/vending industry. Although Appellees proceeded to develop an extensive record, most of their evidence remains susceptible to multiple interpretations such as those described in *Conley*, 859 F.Supp. at 935–36, and therefore does not satisfy Appellees' burden in relation to the critical distinction that must be made in the application of the reliance doctrine as it relates to a pre-trial motion to dismiss. Indeed, Appellees' own expert witness effectively made this point in the following cross-examination by the district attorney concerning the effect of a local ordinance:

Q: [W]ould you agree with me that any of these ordinances do not legalize gambling?

A: They don't legalize it. But what they do is, I believe they place it in a position of video poker machine gambling or video gambling on a *de facto* basis. They are saying we are turning a blind eye to this type of activity and we are not enforcing the laws generally speaking in regard thereto.

Since the trial court adopted Appellees' factual findings and legal conclusions, its disposition similarly mixes their conception of *de facto* legalization into the due process inquiry. This distortion of focus is evident not only in the fact that the trial

other seminal reliance cases, and the Court's other decisional law. *See, e.g., United States v. Socony–Vacuum*, 310 U.S. 150, 226, 60 S.Ct. 811, 846, 84 L.Ed. 1129 (1940)(indicating that tacit approval by, or the implicit assurance of immunity from, government officials for actions known to be illegal is no defense). *See generally* Parry, *Culpability, Mistake*, 25 Am. J.Crim. L. at 42–43 (noting that "[t]he *Socony–Vacuum* principle prevents the reliance doctrine from undermining the even-handed enforcement of the criminal law and decreases the incentives for corruption that could arise if 'assurance[s] that punishment will not attach' created a valid due process doctrine").

Moreover, to the extent that the focus of the inquiry could be shifted to enforcement rather than illegality, local officials clearly lack the authority to bind state officials in this regard. Therefore, the reliance defense should not be made available based upon their advice or conduct concerning *enforcement* efforts, particularly where the primary enforcement occurs at the state level.

court hinged its ultimate conclusion upon its finding that Appellees "believe[d] that they were engaging in conduct that would not result in criminal prosecution," but also from the fact that the trial court's analysis accords no significance to the Commonwealth's evidence that Appellees were at least on notice sufficient to require additional inquiry concerning whether their conduct was proscribed—such evidence included, for example, Appellees' experience in the game business; the character and necessity for modifications to machines; the labels and warnings provided by manufacturers; [22] the terms of written ordinances; [23] the testimony of some local officials concerning their refusal to license devices that contained clearing and recording devices; and Appellees' knowledge of at least some enforcement efforts, albeit sporadic, originating from the state level.[24]

Focusing our inquiry upon whether Appellees established good faith, reasonable reliance upon an interpretation of the law (as opposed to acting upon an expectation of non-enforcement), we find that Appellees failed to establish that the due process reliance doctrine should operate to bar

22. For example, the following warning from a manual was read into the record:

For Amusement Only. The operation of these games and the features therein may be subject to various state and local laws and regulations. It is not intended therein to solicit the sale of such games in any jurisdiction wherein the same may not be lawfully sold or operated.

23. For example, the Oakmont ordinance provided that:

[n]othing in this ordinance shall be in any way construed to authorize, license or permit any gambling devices whatsoever for any machine or mechanism. Nothing in this ordinance shall in any way be construed to authorize, license or permit any gambling device whatsoever or any machine mechanism that has been judicially determined to be a gambling device or in any way contrary to law or that may be contrary to any future law of the Commonwealth of Pennsylvania.

24. We acknowledge the need for deference from an appellate court to the trial court's factual findings and credibility determinations. The absence of consideration for the Commonwealth's evidence and proposed inferences, however, appears to have resulted from the trial court's wholesale adoption of Appellees' proposed findings and conclusions, rather than from any assessment of credibility.

their prosecution. Simply put, the indicators are strong and prevalent that one substantially involved in the gaming business would have good reason to inquire as to the state of the gambling laws, and that Appellees' circumstances were not unique. Thus, the claimed reliance upon the circumstances found to be present cannot be said to be objectively reasonable.[25] Moreover, each of the decisions in *Raley, Cox* and *PICCO* involved either some element of immediacy or of ambiguity in the written law, and thus, susceptibility to administrative interpretation. Here, there is no similar immediacy, as the record reflects a long-term practice of dealing in gambling implements, and no room for administrative interpretation of the gambling laws concerning the distribution of *per se* gambling devices.[26]

25. We note that official conduct and not the defendant's mental state is the primary focus of the inquiry, *see Smith,* 940 F.2d at 714; however, the defendant's state of mind remains relevant as a measure of actual reliance. *See id.* Moreover, the reasonableness of that reliance in the totality of the circumstances remains an essential consideration. *See generally id.; Nichols,* 21 F.3d at 1018 (stating that "the defendant's reliance must be reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation" (citations omitted)); *People v. Woods,* 241 Mich.App. 545, 560, 616 N.W.2d 211, 218 (2000) ("when the citizen knows or should know better, but attempts to seek immunity by claiming reliance on misinformation obtained from a government employee, prosecution is not unfair and estoppel by entrapment should have no application").

26. *See generally United States v. Weitzenhoff,* 35 F.3d 1275, 1290 (9th Cir.1993)(emphasizing the focus of the reliance doctrine upon "a person sincerely desirous of obeying the law" and the presence or absence of "notice to make further inquiries"), *cert. denied sub nom. Mariani v. United States,* 513 U.S. 1128, 115 S.Ct. 939, 130 L.Ed.2d 884 (1995); *United States v. Barker,* 546 F.2d 940, 956 (D.C.Cir.1976) (Merhige, J., concurring)("[t]he reasonableness of reliance may dissipate if one depends on nonenforceable advisory opinions of minor officials"); *Conley,* 859 F.Supp. at 936 ("[r]eliance upon the ambiguous conduct of local officials in enforcing an otherwise clear statute of state-wide application is not reasonable"); *id.* at 935 ("corruption of government officials—federal, state or local—certainly does not raise Due Process concerns about prosecuting any of the parties involved"); Parry, *Culpability, Mistake,* 25 Am. J.Crim. L. at 41 ("[a]lthough these requirements [for the reliance doctrine] properly should be relaxed in situations in which individuals are more likely to rely upon the statements of a government official, the same conditions suggest that such representations should not bind the state beyond the immediate context in which they were provided").

The court in *Conley* perhaps employed a degree of understatement in describing the state of affairs described by the defendants in that case, and Appellees here, as disconcerting. Certainly there is unequal treatment where Appellees are subject to criminal prosecution while many others escape it, and the lodging of criminal charges against Appellees in these circumstances touches upon community mores. The trial court's decision is understandable from this broader frame. But the exercise of prosecutorial discretion by necessity is substantially insulated from judicial review, and therefore, in the limited context of assessing a due process claim seeking to bar a criminal prosecution, the assessment proceeds from a narrower perspective. As noted by the United States Supreme Court,

> Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' [They] are to determine only whether the action complained of ... violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency[.]'

*Dowling*, 493 U.S. at 353, 110 S.Ct. at 674 (citations omitted).

In summary, we hold that Appellees failed to establish a claim pursuant to the due process reliance doctrine that would bar their prosecution for gambling and related offenses. Accordingly, the order of the Superior Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

Justice ZAPPALA concurs in the result.