J-S54015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROSS M. RABELOW, | |
| Appellant | No. 2985 EDA 2014 |

Appeal from the Judgment of Sentence September 22, 2014
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0006370-2012

BEFORE:  BOWES, PANELLA, AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED March 14, 2016**

Ross M. Rabelow appeals from the judgment of sentence of four to forty-four years imprisonment and $650,000 in restitution that the trial court imposed after a jury convicted him of multiple crimes.  We affirm.

From September 2008 to May 2012, Appellant owned and operated American Comfort Home Care Services, LLC ("American Comfort"), which sold contracts for home care services.  Appellant and his salesmen, Bruce Cherry, Thomas Muldoon, and Robert Lerner, targeted senior citizens, some of whom suffered from dementia and senility.  The contracts were worthless, as the evidence established that Appellant never intended to honor them and American Comfort lacked the financial resources to do so.

---

* Former Justice specially assigned to the Superior Court.

Special Agent Karen Tempinski of the Insurance Fraud Section of the Pennsylvania Attorney General's Office began to investigate Appellant in March 2011, after she received a complaint from Inge Neuhauser about Cherry. Cherry had received a check from Ms. Neuhauser that he was supposed to forward to an insurance company to pay for a premium, but the insurance company never received the check. Ms. Neuhauser gave Agent Tempinski a packet of materials that included a contract from American Comfort that Ms. Neuhauser had purchased from Cherry. Since the contract provided 1,000 hours of on-demand, in-home services for $1.59 an hour, which was well below market rate, Agent Tempinski began to investigate American Comfort and Cherry.

The address for American Comfort on the contract was a UPS mailbox store, and Agent Tempinski attempted to locate the actual office of that corporation. Pennsylvania Department of State records established that Appellant owned American Comfort and that he had applied for American Comfort to use the fictitious name National Comfort Home Care Services.

Agent Tempinski's investigation led to other clients, approximately 135 of whom she personally interviewed. They provided the agent with copies of their contracts and evidence of payment. Through the customer checks, Agent Tempinski identified the banks where they were deposited, and obtained the records for bank accounts owned by American Comfort at those institutions. She compiled an exhibit showing American Comfort's financial

transactions. American Comfort collected $774,060 in deposits from September 2008 through May 2012. During that timeframe, just 2.7% of that amount went to finance services for the clients who had purchased them. Commonwealth Exhibit 4; N.T. Trial, 3/17/14 (AM Session), at 63-64. Agent Templinski established that American Comfort sold 245 of the contracts.

Appellant was charged with a total of 733 counts of criminal activity involving the 245 victims who purchased the in-home service contracts from American Comfort. Following an eight-day trial, Appellant was found guilty of criminal conspiracy, corrupt organizations, 244 counts of theft by deception, 244 counts of deceptive fraudulent business practices, and dealing in proceeds of unlawful activity. He was acquitted of theft by failure to make required disposition. After his post-sentence motion was denied, he filed the present appeal, and complied with the trial court's order to file and serve a Rule 1925(b) concise statement of errors complained of on appeal. The trial court thereafter filed its 1925(a) opinion. This matter is now ready for our review. Appellant levels eight issues on appeal:

I. Is the evidence insufficient to sustain the verdicts of guilt?

II. Are the verdicts of guilt against the weight of the evidence?

III. Did the trial court err in precluding testimony that [A]ppellant's company was operated in accordance with industry standards or the business plan of other companies providing home care services, that [A]ppellant's company

was not previously investigated or disciplined and/or that other companies were not investigated or not prosecuted?

IV. Did the trial court err in allowing the Commonwealth to present hearsay testimony?

V. Did the trial court err in allowing the Commonwealth to present expert testimony from lay witnesses or lay experts?

VI. Did the trial court err in denying a motion for a mistrial made as a result of the prosecutor's misconduct?

VII. Did the trial court err in instructing the jury that the Commonwealth was not required to present any victims of the alleged offenses as witnesses at trial?

VIII. Is [A]ppellant's sentence unreasonable, excessive and not reflective of his character, history and condition?

Appellant's brief at 4.

Appellant's first issue is a scattershot sufficiency challenge to all his convictions. "In conducting a sufficiency of the evidence review, we view all of the evidence admitted, even improperly-admitted evidence." *Commonwealth v. Haynes*, 116 A.3d 640, 656 (Pa.Super. 2015). We view all evidence in a light most favorable to the Commonwealth as the verdict winner, and we will draw all reasonable inferences from that evidence in its favor. *Id*. Where evidence presented allows the fact-finder to determine each element of an offense beyond a reasonable doubt, a sufficiency claim fails. *Id*. Importantly, "[t]he Commonwealth may sustain [its] burden by means of wholly circumstantial evidence." *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008). Indeed, "[a]lthough a

conviction must be based on 'more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.'" *Commonwealth v. Eline*, 940 A.2d 421, 432 (Pa.Super. 2007) (citation omitted).

One of Appellant's sufficiency challenges relates to the fact that the Commonwealth failed to present the testimony of all 245 people who purchased American Comfort contracts. Appellant's brief at 37 ("the Commonwealth was required to present all of the victims of appellant's alleged crimes to sustain its burden of establishing appellant's guilt beyond a reasonable doubt"). Since the Commonwealth is permitted to prove its case based upon circumstantial evidence, we reject this assertion. There is no legal requirement that the victim of a crime testify. If that were the case, murders could not be prosecuted.

In his argument of this issue, Appellant also suggests that the convictions are not supported by the evidence in that improper hearsay was utilized to obtain them. The case law clearly provides that "in evaluating the sufficiency of the evidence, we do not review a diminished record," and "we are required to consider all evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings are correct." *Commonwealth v. Gray*, 867 A.2d 560, 567 (Pa.Super. 2005). Hence, to the extent Appellant's sufficiency challenge is premised upon the improper admission of hearsay, we reject it

herein. We will address the question of hearsay in the proper context, *infra*, of whether the trial court's evidentiary ruling was correct.

Appellant was convicted of theft by deception, conspiracy to commit theft by deception, corrupt organizations, deceptive or fraudulent business practices, and dealing in proceeds of unlawful activity. Theft by deception is defined as follows:

> A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:
>
> (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
>
> (2) prevents another from acquiring information which would affect his judgment of a transaction; or
>
> (3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

18 Pa.C.S. § 3922(a).

Appellant challenges the sufficiency of the proof as to whether Appellant induced people to purchase American Comfort contracts by creating the false impression that American Comfort would honor contracts that it did not intend to fulfill. We thus examine the proof adduced in support of that question. Appellant drafted the American Comfort contracts for in-home services, which included "bathing assistance, meal preparation,

shopping, toileting, mobility, laundry, housekeeping, assistance with dressing, grooming, medication reminders and pet care." N.T. Trial, 3/11/14 (AM session), at 110. The contracts stated, "[T]he service contract provider [American Comfort] must provide you with all contracted services **upon demand**, without regard to your medical condition or medical necessity." *Id*. at 111 (emphasis added). The contract also advised its purchasers, "There is no hospitalization required, no claim forms to fill out, no deductible, no co-pays, no age limit. It's affordable, comfortable and safe, and gives you peace of mind." *Id*. Elderly clientele were targeted to buy the documents in question. N.T. Trial, 3/14/14, at 93.

The hourly rate for the services under the contracts were between $1.59 to $2.52, well below market rate to provide those services, and the standard contract obligated American Comfort to provide 1,000 hours of in-home services when asked, which, under the terms of the contract, were reduced to 100 hours if the customer demanded in-home services within six months of purchasing it.

Appellant and his salesmen also sold additional hours to senior citizens, regardless of their need for the extra time. N.T. Trial, 3/12/14 (AM Session), at 78-79. In less than three years, Zatae Atkins paid $22,028.25 to American Comfort for additional in-home services. During a period of fifteen months, William and Dorothy Fox sent $10,335 to American Comfort for more hours. Mona Graham purchased $14,840 in additional hours over

a two and one-half year period; and, during a two-year time frame, Virginia Jakob paid $10,798.

Cherry was American Comfort's main salesmen, selling between eighty and eighty-five percent of the contracts at issue, and he testified against Appellant at trial. Appellant solicited Cherry to come work as a salesman for American Comfort because Cherry had a book of prior insurance customers. In 2011, Cherry was convicted of theft for forging checks taken from a customer's checkbook. Appellant used American Comfort funds to hire a lawyer to represent Cherry, and came to court on days the case was listed before a judge. Cherry was sentenced to serve three to 23 months imprisonment, with work release privileges, but the sentencing court in that matter told Cherry that he was "never allowed to go into a senior citizen's house again" while under supervision. N.T. Trial, 3/11/14 (AM session), at 231. Hence, Cherry was not permitted to go to senior citizens' home to sell them anything while on work release. *Id*. at 232. Appellant was aware of this condition. *Id*. at 238.

Appellant arranged for Cherry to obtain work release by being employed by American Comfort. In the work release application, Appellant represented that Cherry would not be involved in making home visits to potential customers. After Cherry was on work release, Appellant transported Cherry to sales calls and sent him into the homes of senior citizens to sell American Comfort contracts.

Cherry admitted that he and Robert Lerner, another American Comfort salesman, had obtained checks made payable to Lerner from insurance customers and told the customers that the money was going to be used to purchase insurance from other insurers. Cherry and Lerner cashed the checks and split the money between themselves, failing to forward any of the money to the insurance companies. Cherry, individually, also stole money by cashing other checks that customers gave him for insurance services. Appellant continued to employ Cherry after he became aware that Cherry was stealing money from insurance customers.

Appellant and Cherry preferred not to make appointments with their senior citizen customers. Cherry explained that they just made house calls to various residences while they were in the vicinity as that method of sale "provided the element of surprise." N.T. Trial, 3/12/14 (AM Session), at 77. Cherry explained, "Well if we set up an appointment, sometimes like the family would be there, you know, children of relatives, and it would make the selling process more difficult." *Id.* They preferred their elderly customers to be alone, and for them to set up an automatic payment system through their checking account so "it was difficult for them to cancel" the contract. *Id*. at 80.

Once the contracts were sold, Appellant engaged in a series of tactics to avoid American Comfort's fulfillment of any contractual obligations. Office staff were instructed not to answer incoming calls. N.T. Trial, 3/14/14 (AM

Session), at 22. Jeannine Braithwaite, a former employee, would listen to messages left by customers. She stated that she would hear two to three messages a day from people requesting services under their contracts or asking for their money back. Often, the callers were angry. Appellant listened to all the messages that were left.

Only after a customer or family member was "persistent enough and kept calling," would Appellant respond. N.T. Trial, 3/12/14 (AM Session), at 91-92. The response was another delaying tactic. Specifically, even though the in-home services were supposed to be provided upon demand and without any proof of medical necessity, Appellant would placate the insistent customers by going out "personally to the house and assess the situation [for the] need for the care or services." *Id*. at 93. Appellant would further avoid providing the services by attempting to get a health insurer to cover them. N.T. Trial, 3/12/14 (PM Session), at 25.

If it became necessary, due to a particularly persistent customer, Appellant sometimes would issue refunds for premiums "if he knew it was going to cost a lot of money for services." *Id*. at 25. This tactic resulted in savings to American Comfort because the cost of providing the services was substantially more than issuing a refund. Only if family members or law enforcement became involved would Appellant actually provide the services that American Comfort had agreed to deliver. *Id*. at 26. Even then, he

minimized the amount of services provided to the extent that he possibly could, usually providing less than five hours of service. *Id*. at 27.

Cherry knew of only one customer, George Hirsch, who received all of the services to which he was entitled under his contract. Larry Hirsch, George's son, testified that it was extremely difficult to obtain the services and disputed that George received all of the hours of service to which he was contractually entitled. Thirteen people consisting of American Comfort customers, their family members, or their power-of-attorneys testified that American Comfort failed to fulfill its contractual obligations, substantiating the testimony of Cherry.

Cherry also reported that American Comfort did not have the financial resources to pay for the in-home care services that it had contractually agreed to provide. N.T. Trial, 3/12/14 (PM Session), at 21-22. Special Agent Tempinski supported Cherry's testimony in this respect. She also established that American Comfort sold 245 of the worthless contracts and obtained premium payments in return for those documents. Cherry reported that, for every successful sale, there were at least as many unsuccessful attempts to dupe elderly people into purchasing the contracts.

This evidence was sufficient, beyond a reasonable doubt, to establish that Appellant created a false impression that American Comfort would provide services that it did not intend to provide and that customers, in reliance upon that impression, purchased those services. We thus reject

Appellant's first challenge relating to the sufficiency of the evidence to his 244 theft convictions.

Appellant also insists that he cannot be convicted for theft with respect to the policies for which he issued refunds. Appellant's brief at 39. However, Cherry testified that refunds were issued to avoid paying for contracted services and that issuing a refund check was less expensive than fulfilling American Comfort's contractual obligations to provide the services under the contracts. The refund check actually gave any victim less money than they were contractually entitled to receive under American Comfort contracts. This scheme operated as a theft of the difference between the amount of the premium and amount that American Comfort should have paid to fulfill its contractual obligation.

Appellant also asserts that he was convicted of theft in connection with contracts that were invalid due to the fact that customers cancelled the checks issued to purchase them. We have reviewed the exhibit upon which Appellant relies for this assertion, and it does not substantiate this claim. *See* Commonwealth's Exhibits 25 and 26. Those exhibits are a list of American Comfort check payees, and do not, to any extent, contain a list of checks payable to American Comfort and that were canceled by customers. We thus reject this position.

Appellant finally claims that he cannot be convicted on some theft counts since the evidence proved that he did provide some in-home

services.   However, Appellant overlooks that Cherry testified that none of the contracts, except for the one with Hirsch, were actually fulfilled completely.   Cherry's testimony established that, in connection with contracts that Appellant was forced to provide services, Appellant always paid for the least amount of hours possible, often three or four, and that no customer, with the exception of Hirsch, received the full amount of hours to which they were contractually entitled.   Agent Templinski identified 245 contracts for on-demand in-home services purchased from American Comfort.   The jury convicted Appellant of 244 counts of theft, crediting Cherry's testimony that the Hirsch contract was fulfilled.   Hence, we are unpersuaded by Appellant's final attempt to overturn his theft convictions.

Appellant also maintains that his conviction of conspiracy to commit theft is infirm on the basis that the Commonwealth "failed to prove that appellant entered into any agreement with anyone to commit a crime or aided anyone in the planning or commission of any crime." Appellant's brief at 35.  The crime of conspiracy is defined as follows:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a).

To establish the existence of a criminal conspiracy, "the Commonwealth must show a defendant entered into an agreement to commit or aid in an unlawful act with another person; that he and that person acted with a shared criminal intent; and that an overt act was taken in furtherance of the conspiracy." **Commonwealth v. Kinard**, 95 A.3d 279, 293 (Pa.Super. 2014). Appellant's claim relates to the sufficiency of the proof supporting the existence of an agreement to commit the theft crimes. Since an explicit accord can rarely be demonstrated, we permit the inference of a conspiracy "where the conduct of the parties indicates that they were acting in concert with a corrupt purpose in view." **Id**. The following factors are considered when determining whether a conspiracy exists: "(1) an association between alleged conspirators, (2) knowledge of the commission of the crime, (3) presence at the scene of the crime, and (4) participation in the object of the conspiracy." **Id**.

The above-outlined evidence establishes that Appellant and Cherry conspired to commit theft. There was an association between them. They worked together constantly, and Cherry reported that Appellant drove Cherry to the homes of targeted elderly clientele; thus Appellant was present at the scene of the thefts. Cherry's testimony also proved that both he and Appellant knew that the customers would not receive the services

sold under the contracts. Appellant actively participated in the theft through a variety of techniques designed to avoid his company's contractual obligations to provide home care. All of the elements supporting the existence of an agreement were present herein. We therefore reject Appellant's challenge to his conspiracy conviction.

Appellant also was convicted of corrupt organizations under 18 Pa.C.S. § 911(b)(3), and, in connection with this offense, Appellant suggests that the Commonwealth "failed to prove that appellant engaged in a pattern of racketeering." Appellant's brief at 35. Section 911(b)(3) states, "It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 Pa.C.S. § 911(b)(3). The term "enterprise" means "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and **includes legitimate as well as illegitimate entities** and governmental entities." 18 Pa.C.S. § 911(h)(3) (emphasis added). "Racketeering activity" includes an act indictable as theft, dealing in proceeds of unlawful activity, and conspiracy to commit those crimes. 18 Pa.C.S. § 911(h)(1)(i), (iii).

American Comfort, a legal entity which Appellant organized as a LLC, engaged in commerce by issuing insurance contracts in exchange for money.

As substantiated, *supra*, there was an ongoing pattern of activity since American Comfort sold contracts to hundreds of customers and attempted to sell hundreds more, and the sale of the contracts constituted theft by deception. Appellant was associated with American Comfort as he organized it and completely controlled it. Appellant also actively engaged in its commercial activities of selling the fraudulent polices by transporting Cherry to the homes of targeted individuals and personally employing tactics to avoid the contractual obligations assumed by his company under those documents. Hence, the evidence supported the jury's conclusion that Appellant was guilty of the corrupt organizations offense.

Appellant also was convicted of deceptive or fraudulent business practices pursuant to 18 Pa.C.S. § 4107(a), which provides in pertinent part:

> A person commits an offense if, in the course of business, the person:
>
> . . . .
> (2) sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service;
>
> . . . .
> (5) makes a false or misleading statement in any advertisement addressed to the public or to a substantial segment thereof for the purpose of promoting the purchase or sale of property or services; [or]
>
> (6) makes or induces others to rely on a false or misleading written statement for the purpose of obtaining property or credit[.]

18 Pa.C.S. § 4107(a)(2), (5)-(6).

Appellant, in the course of running his business, had Cherry and other salesmen sell contracts stating that purchasers would receive in-home services on demand for a low rate per hour. Appellant did not deliver on those services and never intended to do so. Appellant developed brochures and contracts that promised to provide the services. Both the brochures and contracts misled people and were deceptive because they falsely promised to deliver services. Appellant obtained money in connection with the sale of 245 of those contracts. Hence, Appellant's convictions of 244 counts of deceptive business practices are not infirm.

Finally, Appellant was convicted of dealing in the proceeds of unlawful activity, 18 Pa.C.S. § 5111(a), which provides:

> A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:
>
> (1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.
>
> (2) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity and that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.

18 Pa.C.S. § 5111(a)(1)-(2). An unlawful activity includes "[a]ny activity graded a misdemeanor of the first degree or higher under Federal or State law." 18 Pa.C.S. § 5111(f).

Appellant engaged in theft by deception and deceptive business practices and was convicted of numerous theft and deceptive business offenses graded as felonies. He knew that the property secured by commission of those crimes was the proceeds of those unlawful activities. He used those proceeds to support the continued activities of American Comfort employees, paying commissions to the salesman, so that thefts and deceptive business practices being committed could continue and more fraudulent contracts could be sold. We therefore reject Appellant's challenge to this conviction.

Appellant's second position is that his convictions are against the weight of the evidence. As we have long recognized, "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." **Commonwealth v. Best**, 120 A.3d 329, 345 (Pa.Super. 2015) (citation omitted). We are limited to reviewing "whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." **Commonwealth v. Landis**, 89 A.3d 694, 699 (Pa.Super. 2014).

Appellant again ignores this standard of review. Having established that the Commonwealth may meet its burden by presenting wholly circumstantial evidence, we cannot find that the trial court abused its

discretion in denying Appellant's motion for a new trial based on his claim that the verdict is against the weight of the evidence.

At his third issue, Appellant alleges that the trial court erroneously excluded evidence that Appellant's company complied with industry standards and operated much like comparable entities, including a company with which Appellant was previously affiliated. Appellant sought to use this evidence to show that, because those companies had not been investigated or disciplined, his should not have been.

Our standard of review regarding the admission of evidence is well settled: we review the decision for an abuse of discretion.

> [T]he admissibility of evidence is a matter addressed to the sound discretion of the trial court and ... an appellate court may only reverse upon a showing that the trial court abused its discretion. An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law.

**Commonwealth v. Cox**, 115 A.3d 333, 336 (Pa.Super. 2015) (*en banc*) (citations omitted).

By way of procedural background, we note the following. Early in the instant proceedings, the Commonwealth had leveled charges against Appellant for insurance fraud. Prior to the start of trial, it filed a motion *in limine* seeking to exclude Appellant's proffered evidence of compliance. Following a hearing, the trial court denied that motion, "so long as [Appellant's] argument is and remains that he was not selling insurance."

Order, 12/4/13, at 1. The Commonwealth subsequently withdrew the insurance fraud charges. As the question of whether Appellant was, in fact, selling insurance was no longer at issue, Appellant was not permitted to offer this comparative evidence or non-enforcement testimony. Appellant contends that the prohibition of testimony was improper.

Appellant alleges that the trial court's decision rendered him "handcuffed in defending himself at trial." Appellant's brief at 47. Specifically, he argues that the evidence was necessary to rebut the Commonwealth's allegations that the hourly rate for the services was unusual or that the operation of the company, including the number of clients requesting and receiving services, was akin to companies of similar size and purpose. *Id*. at 49.

The Commonwealth counters that Appellant fails to show that the trial court exhibited manifest unreasonableness that compels reversal on this issue. It continues by noting that evidence relating to the operation of one company is not synonymous with an industry standard and that evidence of prior non-enforcement is inadmissible to show that he had not violated the law. Paralleling the trial court's explanation for its decision in this matter, the Commonwealth relies on **Commonwealth v. Kratsas**, 764 A.2d 20 (Pa. 2001) (prohibiting evidence that authorities declined to enforce law to show that conduct was effectively legal), for this latter proposition.

In **Kratsas**, defendants were owners of a company that leased "game and vending machines" that were allegedly used for illegal gambling activities.  *Id*. at 22.  The defendants sought to introduce evidence of the prevalence of gambling in the region, asserting that "it is the public policy of Pennsylvania that gambling is legal and/or *de facto* legal."  *Id*. at 23.  Our Supreme Court examined, *inter alia*, whether a defendant may introduce the non-enforcement of criminal statutes as evidence of either lax enforcement at large or the defendant's own compliance with a statute, at least with respect to a common understanding of its meaning or enforcement.

The Supreme Court rejected that argument, recognizing that the legislature has clearly spoken on the matter and that the defendants "cite[d] to no authority for the proposition that this or any other court can or should nullify a legislative enactment on the basis that its objectives have been frustrated, or even thwarted pervasively, even by those who are charged with enforcement responsibility."  **Id**. at 26.  Thus, the defendants' conduct was to be assessed in accordance with the relevant statute, not a pattern of enforcement or the lack thereof.

Appellant's attempt to distinguish **Kratsas** on the basis that his evidence was intended to rebut a Commonwealth argument and not stand alone as substantive evidence is interesting, but does not persuade us that the trial court abused its discretion or misapplied pertinent law.  The trial court reasonably characterized all evidence at issue in Appellant's third

argument as evidence of non-enforcement. The trial court herein properly prohibited Appellant from introducing evidence that he had not previously been prosecuted for his business activities. Thus, we find that **Kratsas** controls here and bars comparative and non-enforcement evidence. Likewise, the trial court did not abuse its discretion in finding that comparative evidence, which was irrelevant to show that Appellant was not guilty of any of the several serious infractions at issue herein, was merely an attempt to introduce evidence of non-enforcement by another name. Appellant's third issue fails.

In Appellant's fourth issue, he contends that the trial court erred in permitting the Commonwealth to introduce hearsay testimony about the "making of contracts, the request for services, the payment of money and bank records." Appellant's brief at 51. As noted, we examine the admissibility of the evidence and will affirm the trial court's determination absent an abuse of discretion or misapplication of the law. **Cox**, **supra** at 336.

Appellant's argument in this respect is four pages long. He string cites to places in the record where he objected to the introduction of the evidence. Appellant's brief at 51-52. Meanwhile, these objections were overruled on various grounds, and Appellant presents no cohesive and discernable argument as to why each objection were improperly overruled.

Some of the objected-to statements were permitted in order to explain a course of conduct. For example, Agent Tempinski testified that she met a person who purchased an American Comfort contract and wished to make a complaint. Appellant objected, anticipating that Agent Tempinski would continue to elaborate on the specifics of the conversation. The trial court overruled the objection because the statement was offered to explain Agent Tempinski's course of conduct during the investigation. "[E]vidence that would constitute inadmissible hearsay if offered for one purpose may be admitted for another purpose." *Commonwealth v. Dent*, 837 A.2d 571, 577 (Pa.Super. 2003) (citation omitted). As we have consistently held, "an out-of-court statement offered to explain a course of conduct is not hearsay." *Id*. (citation omitted).

Next, the vast majority of Appellant's hearsay objections were to testimony that a customer of American Comfort called and requested services. Various witnesses commented on this fact. In this respect, the trial court determined that any call requesting service was a non-hearsay, verbal act. Hearsay "is defined as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted." *Commonwealth v. Busanet*, 54 A.3d 35, 68 (Pa. 2012) (citing Pa.R.E. 801(c)). On the other hand, "An out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement." *Busanet*, *supra* at 68.

As outlined in the comment to Pa.R.E. 801, "Communications that are not assertions are not hearsay. These would include questions, greetings, expressions of gratitude, exclamations, offers, instructions, warnings, *etc*." Comment, Pa.R.E. 801. Additionally, "Sometimes a statement has direct legal significance, whether or not it is true." *Id*. As examples, the comment notes that these types of statements "may constitute an offer, an acceptance, a promise, a guarantee, a notice, a representation, a misrepresentation, defamation, perjury, compliance with a contractual or statutory obligation, *etc*." *Id*.

In harmony with this concept, we have noted that, "When a witness testifies that someone said something to him and the purpose is not to show that what was said was true but that the statement was made, the testimony is not hearsay but instead a 'verbal act'". *Commonwealth v. Jones*, 543 A.2d 548, 550 (Pa. Super. 1988); *see also Commonwealth v. Johnson*, 838 A.2d 663 (Pa. 2003) (noting that threats were introduced as verbal acts and were not subject to hearsay rule since they were not offered to establish the truth of the matter asserted but to demonstrate that there was an attempt to influence a witness).

Herein, the statements in questions were not assertions that were admitted to prove the truth of the matter asserted. They were demands, akin to inquiries. The requests for services had direct legal significance in that the callers were invoking their legal rights under American Comfort's

- 24 -

contracts. They were introduced to demonstrate that the statements were made and what Appellant did in response to them. It was irrelevant whether the statements were true or false, that is, whether the caller actually wanted services. Hence, we reject Appellant's position that any testimony relating to the fact that customers made a demand for services under the American Comfort contracts was inadmissible hearsay.

In his brief, Appellant fails to develop any discernable legal position that the customer contract issued by American Comfort to its clientele and the bank records of American Comfort were incorrectly admitted into evidence as hearsay. We note that the trial court determined that the customer contract and bank records were properly authenticated pursuant to Pa.R.E. 901, which states that, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." A document can be authenticated by testimony from a witness with knowledge that "an item is what it is claimed to be." Pa.R.E. 901(b)(1). Cherry had knowledge of the American Comfort contract and authenticated that document. Agent Templinski's testimony about the method that she used to secure American Comfort's bank records substantiated that those records were what they were claimed to be. Hence, Appellant's fourth issue is meritless.

At his fifth issue, Appellant alleges that the trial court erred when it permitted purported expert testimony from Commonwealth witnesses Agent Tempinski, Cherry, and Muldoon without the requisite expert certification. Appellant argues that each witness needed to be certified as an expert in their respective fields: Agent Tempinski as a forensic accountant; Cherry on home care industry standards; and Muldoon on price structuring. As their testimony was outside the scope of a proper lay witness and since they were not qualified as expert witnesses, Appellant alleges that their testimony was improperly admitted.

The Commonwealth maintains that each witness's testimony was factual and properly within the scope of the witness's knowledge as a lay fact witness. Agent Tempinski's testimony consisted of common calculations based on her personal review of Appellant's financial documents, which saved the jury the burden of reaching the same percentages and proportions. Cherry's testimony was based on his personal knowledge of the contracts and Appellant's business, and Muldoon's testimony was similarly based on his personal knowledge and experience with Appellant and the company. Accordingly, no testimony required specialized skill or knowledge and was properly within the purview of proper lay witness testimony.

The scope of lay witness testimony is set forth in Pa.R.E. 701, which provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Appellant objected to the following specific statements on the grounds that the testifying witness was not qualified as an expert. First, Appellant objected to Agent Tempinski's testimony relating a document collecting and organizing Appellant's financial records. The document "names a bank, account number, account holder. It indicates when it was opened, who it was opened by, gives an address, the date it was closed. There is a taxpayer identification number." N.T. Jury Trial, 3/11/14 (AM Session), at 71. The information was repeated for each bank where American Comfort had accounts. Appellant objected, arguing that Agent Tempinski is "certainly not a person who has been qualified in determining what the meaning of those things are." *Id*. Noting that the testimony was factual information and not opinion, the court overruled the objection. *Id*. at 72.

Second, Agent Tempinski explained how her investigation into Appellant and his business began. N.T. Jury Trial, 3/10/14, at 97-98. She testified that one of Appellant's clients, Mrs. Neuhauser, gave Agent Tempinski copies of her contract and payments to Appellant after a

complaint was filed in response to Cherry's failure to forward Mrs. Neuhauser's premium to the insurer. *Id*. at 94-96. She then met with some of Cherry's other clients, who produced similar documentation. *Id*. at 99. Based on the information and documentation given to her, Agent Tempinski "thought the sum of $1.59 for an hour of in-home care service was very strange" and pursued further inquiry. *Id*. at 100. Appellant unsuccessfully objected following that statement. *Id*. A similar objection was lodged in response to documentation containing calculations based on the financial records. *Id*. at 145.

Appellant objected to Cherry's testimony as he explained the operation of the contracts he sold to Appellant's clients. N.T. Jury Trial, 3/12/14 (AM Session), at 43. The exchange that prompted Appellant's objection is as follows:

Commonwealth: When you started as a salesman for American Comfort[,] what was the price per hour for the services that were being sold?

Cherry: A dollar fifty-nine.

Commonwealth: Who set that price?

Cherry: Ross [Rabelow].

Commonwealth: At some point did that price change?

Cherry: Yes.

Commonwealth: Were most of the contracts you sold for $1.59 per hour?

Appellant:        Objection, Your Honor; sidebar.

*Id*. at 43-44.    Appellant's counsel went on to explain that the Commonwealth did not "have an expert to testify in this case to say whether or not this is an industry standard, this price." *Id*. at 45.  The objection was overruled.

Finally, Appellant challenged statements made by Muldoon regarding the price structure of Appellant's company.  The objection followed a question of Muldoon by the Commonwealth of whether Muldoon knew "anything about the price structure of [Appellant's] sales[.]" N.T. Jury Trial, 3/14/14 (PM Session) at 99.  At sidebar, Appellant's counsel explained that the witness had not yet been qualified "as an expert to talk about price structures[.]" *Id*. at 100.  The trial court disagreed that the testimony proposed by the Commonwealth, which was based on conversations between Muldoon and Appellant, constituted expert opinion and overruled Appellant's objection. *Id*. at 102.

Reviewing the proposed and actual testimony of each of the three witnesses, we find no abuse of discretion on the part of the trial court in permitting them to present their respective testimony.  Indeed, rather than explain how the trial court erred in finding that Agent Tempinski's testimony was no more than straightforward calculation or clarify his belief that Cherry and Muldonn's knowledge of the contracts was not based on their own perception, Appellant merely parrots Pa.R.E. 701 in hopes that this Court

may opt to substantiate his claims of complexity and novelty itself. We will not do so. The testimony was factual and based upon personal knowledge, and none of the testimony was of such intricacy that it required specialized knowledge. In each case, the trial court carefully limited the witness's testimony to facts and inferences, not implications or improper opinions, rationally based on his or her perception. As each of the three witnesses had significant knowledge and understanding of the underlying facts of the case and the operation of the company at issue, their testimony was properly admitted.

At Appellant's sixth issue, he alleges that the trial court erred when it denied his motion for a new trial due to prosecutorial misconduct. In a September 24, 2013 motion *in limine*, the Commonwealth sought a ruling to permit the testimony of Terry Keating, Deputy Chief Counsel for Insurance in the Governor's Office of General Counsel, regarding "**events** about which he has personal knowledge, specifically, discussions that he had with defendant and defendant's attorney about American Comfort's contracts." Motion *in limine*, 9/24/13, at 3 (emphasis supplied). Among the conversations and information to be introduced by Keating was the following:

> Keating also discussed with defendant and his attorney the concern that, because the provision of services promised by any American Comfort contract could only be funded by the sale of additional contracts, which in turn obligated defendant to provide an even greater amount of services, his business was functionally a "pyramid mechanism."

*Id*. at 5-6.

In its responsive December 4, 2013 order, the trial court ruled that Keating could testify as a fact witness, though "any and all opinion testimony, including historical statements, that the American Comfort contracts were insurance and that the business was a 'pyramid mechanism' is prohibited." Order, 12/4/13, at 1. The Commonwealth did not elicit such testimony from Keating.

During the Commonwealth's summation at trial, the prosecutor argued the following:

> One person could come in and say I want services 24/7, and Mr. Rabelow cannot provide it. He doesn't have the money. What does he have to do if someone makes the claim, if someone comes in and wants those kind of services? He has to go out and sell even more contracts. If one person wants all the services they paid for, he's got to go out and sell even more. That is what is known as a pyramid scheme. Create obligations – I should say you get money in exchange for certain obligations that you can't meet. The only way you meet your obligations under one contract is to go out and sell many, many more, which creates even more obligations, requiring you to sell again an even greater amount.

N.T. Jury Trial, 3/19/14 (AM Session), at 137.

Appellant's trial counsel moved for a mistrial, arguing, *inter alia*, that the Commonwealth had violated the court's order and that the trial was now tainted. The Commonwealth asserted in response that the order was limited to the testimony of Mr. Keating and that it did not generally prohibit the

mention of the phrase pyramid scheme during the course of the trial. The trial court denied Appellant's motion for mistrial.

On appeal, Appellant again argues that the prosecutor's statements violated the December 4, 2013 order prohibiting Mr. Keating from mentioning a pyramid scheme. Though Appellant concedes that the order specifically addresses Mr. Keating's testimony, he asserts that "[i]f the trial court believed that Keating's reference to a 'pyramid mechanism' was prejudicial, it matters little who makes such a reference." Appellant's brief at 61. He argues secondarily that the comment was inappropriate because it was not based on evidence presented at trial.

The Commonwealth's response is two-fold. First, it argues that the prosecutor did not violate the court's December 4, 2013 order because that order applied only to the testimony of Mr. Keating. Second, it argues that the statement is "a reasonable inference drawn from evidence in the record" and therefore did not serve to deny Appellant a fair trial. Commonwealth's brief at 49. We agree with the Commonwealth.

In reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that:

> [A] prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding

their ability to weigh the evidence objectively and render a true verdict.  Prosecutorial misconduct is evaluated under a harmless error standard.

***Commonwealth v. Manley***, 985 A.2d 256, 269 (Pa.Super. 2009) (citation omitted).  We further recognize that "[t]he decision to declare a mistrial is within the sound discretion of the [trial] court and will not be reversed absent a flagrant abuse of discretion."  ***Commonwealth v. Szakal***, 50 A.3d 210, 218 (Pa.Super. 2012) (citation omitted).

Upon review of the Commonwealth's motion *in limine* and Appellant's several responses thereto, we find no support in the record for Appellant's contention that the trial court intended to prohibit all mention of the phrase "pyramid scheme" rather than restrict only Mr. Keating's use of it.  Indeed, the only mention of that phrase in the several filings is in the Commonwealth's initial motion, where it proffered that Mr. Keating may testify that he challenged Appellant on the financial sustainability of his business, which was "functionally a 'pyramid mechanism.'"  Motion *in limine*, 9/23/13, at 6.

In his responsive filings, Appellant does not seize specifically on this language.  Instead, he argues only that the information contained in several paragraphs, including the one in which the phrase is found, is "expert opinion as to whether the contracts used by defendant's company comply with the insurance statute."  Brief contrary to the Commonwealth's motion *in limine*, 10/24/13, at 7.  At no point did Appellant specifically request the exclusion of

the phrase as unduly prejudicial. We therefore cannot find that the trial court intended to preclude the mention of a "pyramid scheme" by anybody other than Mr. Keating, especially in light of the fact that the order specifies no such intent. Accordingly, the Commonwealth did not violate the trial court's December 4, 2013 order when the prosecutor labeled Appellant's business a pyramid scheme.

In its opinion, the trial court explained that the Commonwealth had presented sufficient evidence from Agent Tempinski, Cherry, and additional witnesses that showed "Appellant's financials were precarious and that he needed the sale of new American Comfort contracts to fund any possible requests for services that came in that he was unable to get around." Trial Court Opinion, 2/25/15, at 28. Not only did the Commonwealth comply with the trial court's order, but the prosecutor's comments were supported by the evidence such that the court did not abuse its discretion in denying Appellant's motion for a mistrial.

Appellant's seventh issue is a challenge to a specific jury instruction. He alleges that the trial court improperly instructed the jury that the Commonwealth was not required to present at trial any victims of Appellant's conduct. Appellant concedes that his "objection was not made prior to the jury's deliberations as required by Pa.R.Crim.P 647([C])[.]" He maintains, however, that the objection was "made sufficiently early" in deliberations to be within the spirit of the rule. Appellant's brief at 63-64.

The law is well settled that "[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto **before the jury retires to deliberate**." Pa.R.Crim.P. 647(C) (emphasis added). Appellant cites to no authority suggesting that an objection while the jury is deliberating satisfies the spirit of the Rule or suffices to overcome settled case law stating that "the failure to make a timely and specific objection before the trial court at the appropriate stage of the proceedings will result in waiver of the issue." *Commonwealth v. Houck*, 102 A.3d 443, 451 (Pa.Super. 2014). Appellant's claim is waived.

Appellant's final issue challenges the reasonableness of his sentence on two distinct grounds. First, he alleges that his sentence is excessive, not reflective of his unique circumstances and qualities, and motivated by the sentencing court's personal animosity toward him. Second, he alleges that the disparity between his sentence and Cherry's sentence "was never explained and cannot be justified under any circumstance." Appellant's brief at 72.

In response, the Commonwealth, noting that Appellant was sentenced in accordance with the applicable sentencing guidelines and below the statutory maximums, argues that the sentencing court sufficiently considered Appellant's individual needs, background, and circumstances in fashioning his individualized sentence. The sentencing court specifically acknowledged that it reviewed Appellant's pre-sentence investigation report

and considered the statements and support offered by friends and family. According to the Commonwealth, the sentencing court did not abuse its discretion.

The Commonwealth does not address Appellant's argument with respect to Cherry. The sentencing court maintained in its 1925(a) opinion that it offered sufficient reasons for Appellant's sentence and that it was not required to specifically address the disparity between the sentences because Appellant and Cherry, who accepted a plea, were not similarly situated at the time of sentencing.

As Appellant challenges the discretionary aspects of his sentence, he must petition for permission to appeal those issues, as "the right to pursue such a claim is not absolute." ***Commonwealth v. Rhoades***, 8 A.3d 912 (Pa.Super. 2010). Our jurisdiction over a claim regarding the discretionary aspects of sentence must be established as follows:

> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, see Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S. § 9781(b).

***Commonwealth v. Levy***, 83 A.3d 457, 467 (Pa.Super. 2013). Appellant has satisfied the first three parts of the test. We also find that both of Appellant's arguments raise substantial questions. ***See Commonwealth v.***

*Baker*, 72 A.3d 652 (Pa.Super. 2013) (finding that appellant's claim that the sentencing court unduly weighted the nature and circumstances of the crime presented a substantial question); *Commonwealth v. Mastromarino*, 2 A.3d 581 (Pa.Super. 2010) (finding that appellant raised a substantial question by alleging that his sentence was excessive when compared to those of his co-defendants). Though we may reach the merits of Appellant's arguments, we nonetheless find them both to be meritless. We recognize:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Id*. at 589 (citation omitted).

At Appellant's sentencing, the court specifically noted that it considered letters submitted on Appellant's behalf, the pre-sentence investigation report, and Appellant's family life, education, employment, criminal history, and medical issues. N.T. Sentencing, 9/27/14, at 43-47. Thus, it considered Appellant's unique history and circumstances. It also noted Appellant's specific involvement in the criminal enterprise, recognizing that he "was the architect of a corrupt organization, designed and operated by him." *Id*. at 45-46. While the court also expressed justified frustration with Appellant's conduct, it explained that the sentence was reflective of the

breadth of the harm he caused to many vulnerable and elderly victims. We are satisfied that the sentencing court properly relied on Appellant's unique circumstances and gave appropriate weight to the nature of his crime. We therefore reject Appellant's argument that his sentence is excessive because it was impermissibly based solely on the nature and circumstances of the crime to be meritless.

Appellant's second position is his sentence must be vacated due to the difference between his sentence, four to forty-four years, and the one imposed on Cherry, twenty-three to forty six months. He maintains that the "disparity in sentence was never explained and cannot be justified under any circumstance." Appellant's brief at 72.

Initially, we observe that Appellant did not raise this claim after he was sentenced; it was first presented in his post-trial motion. The court was therefore required to justify the difference after the fact, and, contrary to Appellant's position, the disparity was explained. The court observed that the two defendants were not similarly situated in that Cherry took a plea agreement. Trial Court Opinion, 2/25/15, at 36-37 ("Cherry was sentenced after the entry of an open guilty plea and Appellant decided to proceed to jury trial. Therefore, they were not similarly situated at the time of sentencing[.]").

We have observed that a co-conspirator "who has successfully negotiated a plea deal and a defendant sentenced after a jury trial . . . are

not similarly situated for sentencing purposes." ***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa.Super. 2010). Hence, "a disparity in sentencing between a defendant sentenced after a trial and a co[-actor] sentenced pursuant to a negotiated plea deal does not demonstrate the trial court penalized the defendant for exercising his right to a jury trial." ***Id***.

Furthermore, a defendant is not entitled to the same sentence as that imposed on another person involved in the same crime. ***Mastromarino***, ***supra***. Rather, "when there is a disparity between co-defendants' sentences, a sentencing court must give reasons particular to each defendant explaining why they received their individual sentences." ***Id***. at 589. The sentencing transcript establishes that the trial court gave ample reasons particular to Appellant for sentencing him as it did. N.T. Sentencing, 9/22/14, at 43-47. Thus, Appellant's claim fails on this basis alone.

Finally, we reject Appellant's assertion that the disparity cannot be justified under any circumstances. Appellant, rather than Cherry, was the architect of the enterprise. Appellant formed the company and drafted the contracts and brochures used to deceive the elderly clients. Appellant actually solicited **Cherry** to join in the scheme. Cherry not only pled guilty, but he also cooperated with the Commonwealth by testifying against Appellant. Hence, we find ample reason to support the difference in the sentences imposed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2016